**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **COPPERTREE VILLAGE HOLDINGS, LLC AND COPPERTREE APARTMENTS LLC,** | § § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO. 4:20-cv-0295** |
| **TRIUMPH HOUSING MANAGEMENT, LLC, PAUL J. PONTE, DAVID GATES, AND GREGORY B. JONES** | § § § § § | |
| **Defendants.** | § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Coppertree Village Holdings, LLC and Coppertree Apartments LLC (collectively, "**Coppertree**" or "**Plaintiffs**") file this First Amended Complaint against Defendants Triumph Housing Management, LLC ("**Triumph**" or "**Agent**"), Paul J. Ponte, David Gates, and Gregory B. Jones, (collectively, "**Defendants**").

## I.     INTRODUCTION

1.     Plaintiffs bring suit to recover the damages they sustained as a result of Defendants' wrongful conduct in managing property owned by Plaintiffs. Defendants' wrongful and negligent acts and omissions have resulted in significant damages to Plaintiffs.

2.     Coppertree hired Triumph to manage an apartment complex located at 1415 W. Gulf Bank Rd., Houston, Texas (the "**Coppertree Property**"). Coppertree and Triumph entered into a Management Contract ("**Management Contract**"), which set forth Triumph's obligations to rent the units at the Coppertree Property, maintain and repair the Coppertree Property, maintain

1

records and provide Coppertree with financial reporting, and ensure that appropriate insurance protected the Coppertree Property.

3. Triumph failed to discharge its duties and obligations with respect to management of the Coppertree Property. When Coppertree fired Triumph in March 2019, the Coppertree Property was in disrepair, Triumph had caused Coppertree losses in rental income, and units were vacant.

4. In addition, the Coppertree Property experienced a $1.2 million fire loss in December 2017. The property insurer denied coverage for the loss and sued Triumph to rescind the policy, alleging various misrepresentations in the application process. Coppertree was not a party to the litigation. Over Coppertree's objections, Triumph colluded with the property insurer to rescind the policy and void the coverage that protected the Coppertree Property. Despite multiple requests, Triumph has provided little information to Coppertree regarding disposition of the funds paid to Triumph by the insurer.

5. Finally, Ponte, Jones, and Gates breached duties and made misrepresentations to Coppertree, which resulted in damages to Coppertree.

6. Coppertree now sues Defendants for the substantial losses Coppertree sustained as a result of Defendants' wrongful conduct, misrepresentations and fraud in managing the Coppertree Property. As a result of Defendants' mismanagement and breaches of duties, Coppertree has suffered losses in excess of $3.5 million.

## II.    PARTIES

7. Plaintiffs Coppertree Village Holdings, LLC and Coppertree Apartments LLC are Delaware limited liability companies with their principal place of business in Houston, Texas.

8.     Defendant Triumph is a Georgia limited liability company whose sole member is Tripoli Management, Inc., a Delaware corporation, with its principal place of business in Atlanta, Georgia. Triumph conducts business in the State of Texas and entered into a contract with Plaintiffs regarding the management of the Coppertree Property. Pursuant to the Federal Rules of Civil Procedure, Triumph may be served with this Amended Complaint through its attorney of record.

9.     Defendant Paul J. Ponte ("**Ponte**") is an individual residing in Cumming, Georgia and at all relevant times he was the Chief Executive Officer of Triumph.  Pursuant to the Federal Rules of Civil Procedure, Ponte may be served through his attorney of record.

10.     Defendant David Gates ("**Gates**") is an individual residing in Lake Mary, Florida. At all relevant times, Gates was the Chief Operating Officer of Triumph. Pursuant to the Federal Rules of Civil Procedure, Gates may be served through his attorney of record.

11.     Defendant Gregory B. Jones ("**Jones**") is an individual residing in Cumming, Georgia. At all relevant times, Jones was a Member of Triumph.  Pursuant to the Federal Rules of Civil Procedure, Jones may be served with this Amended Complaint through his attorney of record.

### III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action under 28 USC §1332(a) because complete diversity of citizenship exists between Plaintiffs, on the one hand, and Defendants, on the other hand; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Plaintiff Coppertree Village Holdings, LLC is a Delaware limited liability company, d/b/a in Texas as Coppertree Investments I LLC.  C. David Taylor, who is domiciled in and is a citizen of the State of Washington is its sole member.

14.     Plaintiff Coppertree Apartments LLC is a Delaware limited liability company, d/b/a in Texas as Coppertree Investments II LLC.  Its sole member is Rockport Investors LLC, a

Washington limited liability company. Rockport Investors LLC has eight members, none of whom are citizens of Georgia, Florida or Delaware.

15.     Triumph is a Georgia limited liability company whose sole member is Tripoli Management, Inc., a Delaware corporation, with its principal place of business in Atlanta, Georgia. Consequently, Triumph is a citizen of the states of Delaware and Georgia.

16.     Upon information and belief, Jones and Ponte are domiciled in and are citizens of the state of Georgia with the intent to remain there permanently.

17.     Upon information and belief, Gates is domiciled in and is a citizen of the state of Florida with the intent to remain there permanently.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, or a substantial part of property that is the subject of the action is situated in this District.

## IV.     FACTUAL BACKGROUND

### A.     Coppertree hires Triumph to manage the Coppertree Property

19.     Coppertree owns the Coppertree Village Apartments, located at 1415 West Gulf Bank Road, Houston, Texas. The Coppertree Property provides Section 8 housing financed or subsidized by the United States Department of Housing and Urban Development ("**HUD**").

20.     Triumph is a property management company, which manages or managed apartment complexes for clients throughout the United States.  During some of the relevant time period, Ponte, Gates, and Jones were the principals and/or management of Triumph.

21.     In July 2015, Coppertree entered into a Management Contract with Triumph, pursuant to which Triumph would manage the Coppertree Property. Ponte signed the Management Contract on behalf of Triumph.

22.     Coppertree hired Triumph because it claimed to be a premier property management company with the experience, strong track record, and knowledge necessary to manage multi-family properties such as the Coppertree Property. Triumph represented that it possessed the skill and knowledge to manage the Coppertree Property. Triumph also represented that it would operate the Coppertree Property in accordance with applicable HUD rules, regulations, and policies.

23.     In order to induce Coppertree into entering into the Management Contract, Ponte and Jones expressly stated to Coppertree's representative, David Taylor ("**Taylor**"), in June 2015 that they had connections and expertise and a good relationship with HUD employees in Texas, that Triumph had a competent and robust accounting and finance department, that Triumph had stable and reliable employees with relevant Section 8 housing experience, and that Triumph had the knowledge and expertise to properly prepare and maintain accurate tenant and financial information as required by HUD. They continued to make these representations during the duration of the Management Contract. Additionally, during the course of the Management Contract, Ponte continued to promise that he and Triumph would use their best efforts and sufficient time and resources to properly manage the Coppertree Property. However, they never intended to do so and instead neglected the Coppertree Property, including, on information and belief, numerous instances when Ponte and Jones neglected obligations to Coppertree by intentionally diverting their time and attention, and the attention of those hired by Taylor to act in the best interest of Coppertree, away from the Coppertree Property and toward separate transactions pursued for their own personal benefits. Such transactions did not benefit the Coppertree Property, and instead created damage to the Coppertree Property through the diversion of time, resources and attention.

## B. The Management Contract

24. The Management Contract provides that Triumph had the "sole and exclusive right to manage and operate" the Coppertree Property and with "the power and responsibility for all operations, maintenance, staffing, negotiating of contracts, and otherwise managing and operating the [Coppertree Property]."

25. Triumph's duties and responsibilities enumerated in the Management Contract required that Triumph comply with duties relating to (1) rentals, (2) maintenance and repairs, (3) records and reports, (4) employees, and (5) insurance. Triumph also agreed to:

> (a) perform all tasks and services in a faithful, diligent and efficient manner; (b) use its best efforts to prevent waste of the assets of the [Coppertree Property]; (c) maintain businesslike relations with tenants and visitors of the [Coppertree Property]; (d) use its best efforts to collect all revenues, rents, fees and other sums and charges due from tenants of the [Coppertree Property]; and (e) operate the [Coppertree Property] in a manner in conformance with all Requirements, including HUD Requirements, and with all Project Requirements and any other reasonable directions of [Coppertree] from time-to-time, consistent with this [Management Contract].

## C. Gates' New Company Scheme

26. In late 2017, Gates traveled to Houston to inspect the Coppertree Property, and by early 2018, Gates began reporting to Andre Koren ("**Koren**"), another Coppertree representative, that Gates believed Triumph was not working in the best interests of Coppertree, but that he, personally, would start looking out for Coppertree. While Triumph was tasked with managing the Coppertree Property, and despite being an employee and COO of Triumph, Gates began pursuing his own personal agenda and opportunities, adverse to Triumph. Gates operated between these two lanes – sometimes in his official Triumph representative capacity, while at other times pursuing his own personal agenda to join forces with Taylor to form a new company, which he, Gates, would run and from which he would personally gain.

27.     It became evident in 2018 that Triumph's management and maintenance of the Coppertree Property was sorely lacking and deficient. Triumph did not have adequate and/or competent management personnel or staff on the Coppertree Property, as Ponte and Jones had promised, and as a result, there were no appropriate rental or management services, maintenance or repair services, or reports and financial information as required by HUD and by the Management Contract. Triumph failed to even have a manager on-site for the 324-unit Property. As a result, the Coppertree Property and units fell into overall disrepair and began to deteriorate, with rentals and rental income falling dramatically, and tenants and potential tenants having no competent manager or staff to communicate with on a regular basis.

28.     Meanwhile, in 2018, Gates in his individual capacity began systematically pushing the idea to Taylor of starting a new property management company that Taylor would own and Gates would run. Gates also began providing Koren and Taylor "inside" information as to Triumph's failure to properly manage the Coppertree Property, to maintain tenant and financial files, and to staff the Coppertree Property, information that Taylor and Koren were not receiving directly from Triumph. After visiting the Coppertree Property, Gates began in 2018 to strongly criticize Triumph's management of the Property to Koren and Taylor, and insisted that he personally could correct Triumph's failings and properly manage the Coppertree Property and other properties in which Taylor had an ownership interest. This was all part of Gates' scheme to have Taylor start a new management company which he, Gates, could manage and from which he would personally profit (Gates' "**New Company Scheme**").

29.     In January 2018, in furtherance of his New Company Scheme, Gates sent Koren several emails with drafts of a "Management Pro Forma" spreadsheet with projected revenues and budgets for 11 properties, including the Coppertree Property and three other properties in Texas.

On March 9, 2018, Gates sent Koren a proposed 90-day timeline with Major Milestones, including a projected July 1, 2018 deadline to transfer the properties from Triumph to the proposed new management company. In August 2018, Gates was still pushing the formation of the new management company and on August 8, 2018, Gates sent Taylor and Koren a plan for the new company entitled "Viking Management Plan" with the request to discuss it with Taylor.

30. As set forth below, during this time the Coppertree Property had failed the July 2018 MOR performed by HUD. Gates assured Taylor and Koren that on their behalf he would personally ensure that the property management failures of Triumph would be fixed under his direct supervision until Coppertree terminated Triumph according to his recommended schedule. Taylor relied on Gates' representations and promises and, at Gate's direction, refrained from terminating Triumph for its exceedingly poor performance.

31. Gates sent Koren a copy of his Employment Agreement with Triumph, which contained a non-competition provision. Gates proposed that Coppertree keep Triumph as the property manager for a sufficient period 1) to allow Gates to terminate his employment with Triumph and become an independent contractor in order to allow his non-compete to expire; and 2) according to Gates, to keep Triumph financially obligated for the Coppertree REAC corrective work promised by Ponte (as set out in paragraph 46 below).

32. For his own personal interests, Gates assured Taylor and Koren that he would protect the interests of Coppertree, and that Triumph was unable and/or uninterested in doing so. As part of this New Company Scheme, in September 2018, Gates personally traveled to the Coppertree Property again to confirm that there was a suitable plan in place to ensure that the Property would pass the upcoming REAC inspection. In Texas, as part of his New Company Scheme and to further ingratiate himself to Taylor, Gates negotiated contracts with vendors for

Coppertree and the other Texas properties, including signing a contract with a vendor in his own name in preparation for the REAC inspection at another Texas property Taylor represented. Gates' efforts were part of an attempt to establish vendors of his choosing for the Texas properties so those vendors would be in place when Gates' proposed new company took the management of those properties away from Triumph. With regard to the Coppertree Property, Gates enlisted Interstate Restoration to repair units on the Property, but the contract Gates signed had no scope of work, no plan of action, or even a cost estimate, which ultimately proved to be a very costly mistake to Coppertree.

33. In December 2018, to garner further favor with Taylor and Coppertree, as opposed to working on behalf of Triumph, Gates personally attended a mandated conference with the Texas Department of Housing & Community Affairs ("**TDHCA**") as a representative of Coppertree. The TDHCA imposes certain state-mandated requirements, similar to requirements imposed by HUD. Ultimately, because of Defendants' failures with respect to meeting those requirements, TDHCA imposed a fine of $5,000 on Coppertree.

34. In September 2018, significant bad debt and tenant delinquencies were reflected on the monthly Profit & Loss Statements from Triumph for the Texas properties. Gates, again as part of his efforts to curry favor with Taylor, alerted Taylor and Koren to the fact that Triumph's financial reports to Coppertree were full of errors, due in part because Triumph had outsourced its accounting services to an outside vendor. In fact, after September 2018, Coppertree did not receive a timely monthly P&L Statements from Triumph. In any event, on his own, Gates personally assured Koren that he would correct the errors. Later in September, Gates sent Koren a new "corrected" spreadsheet with a decrease in the bad debt and tenant receivables, which Gates claimed corrected the significant errors contained in Triumph's Statements. However, none of the

financial information from Gates could be verified as correct. Having voluntarily undertaken this responsibility, Gates had the duty to use reasonable care in preparing the information, which he did not do. Because the financial information could not be verified, Coppertree's subsequent audit included negative findings that adversely affected the underlying value of the Property and Coppertree's ability to obtain financing.

**D.   Defendants' Failures**

35.   While Gates promoted his New Company Scheme and worked back-channels to ingratiate himself to both Taylor and Koren, all for his personal benefit, Triumph neglected nearly every aspect of the property and failed to provide the high level of services, despite the original representations made by Jones and Ponte, that induced Coppertree to hire Triumph. The major failings are included below.

**1.   Coppertree Property's failing July 2018 MOR and September 2018 REAC scores**

36.   Coppertree Property, as a Section 8 housing property, was subject to periodic Management and Occupancy Reviews ("**MORs**") of the Property by HUD. Extensive paperwork and reports are required to be prepared and produced by the housing facility during a MOR, which are not an issue if the appropriate financial records are regularly maintained in the normal course of business. In other words, if proper financial records are maintained on an ongoing basis, much of the financial information is already available for the MOR.

37.   Because the purpose of a MOR includes maintaining proper housing for target populations, and ensuring good physical and financial health of the properties, the primary items that are reviewed and inspected include:

- The general physical appearance and security of the property;

- The follow-up and monitoring of project inspections;

- Confirmation that maintenance and standard operating procedures (SOPs) are in place;

- Financial management and procurement processes;

- Confirmation of Leasing & Occupancy compliance;

- Tenant/management relations; and

- General management practices.

38.     In August 2018, Triumph received notice that the Coppertree Property failed its July 26, 2018 MOR. The MOR inspection report detailed a number of systematic failures by Triumph, including the failure to properly review and maintain tenant files in compliance with HUD requirements.  Gates, in his personal capacity and to garner favor with Taylor, told Taylor and Koren that Triumph was responsible for the failed MOR and that he, Gates, would personally see that the deficiencies were corrected and that he would be responsible for preparing the response to the Southwest Housing Compliance Corporation ("**SHCC**"), the Performance Based Contract Administrator for HUD. On October 19, 2018, Gates sent Triumph's response to Nicholas Vranes, Compliance Manager for SHCC. However, Gates repeatedly failed to provide complete responses, which required SHCC to repeatedly seek additional information and the MOR was not officially closed until December 2018.  Such conduct further diminished the Property's reputation with HUD officials.

39.     At this time, HUD was becoming increasingly suspicious of Triumph and skeptical of Triumph's management of the Coppertree Property. As a result of HUD's mistrust of Triumph and Coppertree's dismal MOR score, HUD scheduled an inspection of the Coppertree Property by HUD's Real Estate Assessment Center ("**REAC**").

40.     In September 2018, Gates traveled to Coppertree, telling both Taylor and Koren that he, Gates, would personally oversee Triumph employees and vendors and ensure that there

was a suitable plan in place so the Coppertree Property either would pass the REAC inspection or would be able to have such inspection delayed for a period of time sufficient to allow Defendants to prepare the Coppertree Property such that it would successfully pass such inspection. However, despite these personal promises, Gates failed to exercise reasonable care in performing the promised oversight and services and Coppertree failed the September 27, 2018 REAC inspection with a dismal score of 31 out of 100. Prior to Triumph's takeover of the management of the Coppertree Property, the Coppertree Property's REAC score was 92.

41.     Shortly before the REAC inspection, in a telephone call with Taylor, Michael Gamez, HUD's Southwest Region Resolution Specialist Branch Chief, told Taylor that Triumph, and specifically Ponte, had been dishonest and had misled HUD in order to postpone prior scheduled REAC inspections of the Coppertree Property. Gamez told Taylor that on at least two occasions Ponte had represented that "work was being performed on the property" in order to delay the REAC inspections, when in fact there was no evidence that any work had been done either time. In the telephone call, Gamez questioned Triumph's and Ponte's trustworthiness, as well as their ability to manage the Coppertree Property or any Section 8 properties.

42.     Prior to this time, Ponte and Jones had represented to Coppertree that they had close working relationships with HUD and other regulatory officials and that they had earned the trust of these regulatory entities as a result of these relationships. Ponte and Jones also represented that Triumph had a competent and robust accounting and finance department, that Triumph had stable and reliable employees, including the employees and staff on property with relevant Section 8 housing experience, and that Triumph had the knowledge and expertise to properly prepare and maintain accurate tenant and financial information as required by HUD. But as set forth above, this was not true. Triumph's misrepresentations to HUD and the withholding of material

information from HUD were all to hide and coverup Triumph's management deficiencies at the Coppertree Property.  These wrongful acts and omissions by Ponte and Jones, eventually discovered by HUD in the summer and fall of 2018, caused harm to Coppertree's relationship with HUD and substantial costs and expenses to respond to and correct the management-related deficiencies discovered and documented by HUD.

43.     During this time, Gates' efforts to promote his New Company Scheme and convince Taylor to start the new proposed management company intensified. Gates stressed to Taylor that the management and staff at Triumph were incompetent and that he was prepared to take over the management of the Coppertree Property and the other properties. Gates assured Taylor that he had the expertise and the ability to hire professional management and maintenance staff and was prepared to take over the operations of all of Taylor's properties, including the Coppertree Property and other Texas properties.

44.     In October 2018, in his efforts to have Taylor start a new property management company, Gates submitted additional information to Taylor and Koren as to Triumph's neglect and mismanagement of the Coppertree Property. Gates told Taylor and Koren that he would "personally" oversee a renovation plan to correct all of the deficiencies at the Coppertree Property.

45.     Triumph never provided the level of management services originally represented by Jones and Ponte and as required under the Management Contract.  Despite Gates' personal promises and attempts to "fix" Triumph's deficiencies at the Coppertree Property and the other Texas properties, Gates' back-channel actions and failure to exercise reasonable care in performing the services he promised only made matters worse at the Coppertree Property, resulting in more damages to Coppertree.

## 2.  Fraud and the failure to provide records and reports

46.     After the Coppertree Property failed the MOR and REAC inspection, Ponte promised in an October 3, 2018 email to Koren to have all of the financial reports and tenant files of all Texas properties, including the Coppertree Property, audited and made "HUD compliant" within 60 days, with all costs paid by Triumph. Specifically, Ponte stated that:

> Triumph will pay for a third party compliance person to review and correct all files for all 4 properties within the next 60 days; with Waco to start next week. . . . [W]e have hired someone who will review Resident and HAP receivables, monitor recertifications, ensure that notices are sent on a timely basis for residents that are late on payments, etc. We are in the process of interviewing a Regional Manager candidate for Texas which her sole portfolio will be the Texas properties, including Coppertree.  You will have an opportunity to interview her as well.  I along with the Regional Manager will review financial and operational performance with you on a monthly basis.  Finally, we will be performing 100% REAC protocol inspection on all of your sites; at our cost.

47.     Despite these promises and the deplorable condition of the records and reports for the Coppertree Property and the other properties, Ponte never intended for Triumph to pay these costs and the costs were in fact folded back into the management fees and expenses charged to Coppertree. To hide this fraud, Ponte and Triumph stopped providing any financial reports or statements to Coppertree.

48.     Even prior to this, Triumph breached the Management Contract in failing to provide Coppertree appropriate, complete, and accurate reports and records.  Section VI.5 of the Management Contract required Triumph to "maintain all existing records, and, on a going forward basis" establish and maintain "full and adequate books of accounts, using the accrual method of accounting, and such other records as are necessary to reflect the results of the operation of the" Coppertree Property. These services as agreed to in section VI.5 of the Management Contract are referred to as the "Records and Reports Services."

49.     Triumph breached the Management Contract by failing to provide "a monthly Owner's Report in the form developed by [Triumph] with the approval of [Coppertree];" "a current month rent roll showing delinquencies and vacancies to the extent not available to [Coppertree] electronically;" "a statement of income and expenses and accounts receivable and payable for the preceding month;" "a rent roll/cash receipts form for the previous month to the extent not available to [Coppertree] electronically;" "a check register for the previous month;" "current bank statements with reconciliation for the Property Accounts;" "a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims and potential claims, for the previous month and any other information required by the Requirements;" "a balance sheet of the project;" "an income statement with actual vs. budget comparisons;" and "to the extent available from bank . . . , copies of cancelled checks for insurance premiums paid[.]"

50.     In addition, without Plaintiff's knowledge or consent, Defendants privately arranged to sell a controlling interest in Triumph to a third party.  Included in that transfer was the termination of direct accounting services for the Coppertree Property and the outsourcing of those services to other unqualified third parties, all for the financial benefit of Defendants and to the detriment of Coppertree.  The third-party accounting service selected by Defendants had little or no knowledge or experience with this specialized business area, which caused further damage to Coppertree. Ponte and Jones failed to disclose the details of such transfer, allowing Defendants to continue to conceal their misconduct and failures to comply with the Management Agreement.

51.     To induce Coppertree to enter into the Management Contract, Ponte and Jones represented that Triumph had a competent and robust accounting and finance department, that Triumph had stable and reliable employees with relevant Section 8 housing experience, and that

Triumph had the knowledge and expertise to properly prepare and maintain accurate tenant and financial information as required by HUD.

52.     Contrary to Jones' and Ponte's representations that induced Coppertree to hire Triumph, Triumph's internal controls did not effectively manage its daily accounting and financial reporting in an accurate and timely manner. As a result, Triumph was unable to provide Coppertree with timely and accurate monthly financial statements, operational accounts payable, operational accounts receivable, and information to complete an audit. Triumph did not properly track and report on tenant accounts receivable, and Coppertree received monthly financial statements that included incorrect amounts for tenant accounts receivable and bad debt expense, although for some months, Coppertree did not receive any statements at all.

53.     Triumph failed to properly and effectively use OneSite, a property management software. Triumph failed to set up OneSite to capture vacancy and special claims, resulting in the failure to capture to any portion of vacancy losses through the HUD vacancy claims process. As a result, Coppertree was not able to recover an estimated 50% of the Property's vacancy losses during the time Triumph managed the Coppertree Property.

54.     Pursuant to the Management Contract, upon termination, Triumph was required to remit all funds deposited or remaining in any operating or trust accounts, including any tenant security deposits. Triumph failed to do so, despite repeated requests by Coppertree on July 15, August 1, September 2, and September 19, 2019.

**3.      Triumph's failure to provide rental services**

55.     Section IV.3 of the Management Contract set forth the parties' agreement regarding Triumph's rental responsibilities at the Coppertree Property. As agreed in the Management Contract, Triumph was to "offer for rent and . . . use its best efforts to rent the housing units in the

[Coppertree Property] in accordance with all Requirements (including HUD Requirements and Project Requirements)," the appropriate rent schedule, and leasing guidelines provided by Coppertree. The services that Triumph agreed to provide in section IV.3 of the Management Contract are referred to herein as the "Rental Services."

56.     Triumph breached the Management Contract by failing to use its best efforts to provide Rental Services and lease the apartments at the Coppertree Property. Triumph's breaches included failing to: (1) "show housing units for rent . . . to all prospective tenants;" (2) "take and process applications for rentals, including prospective tenant interviews and credit checks;" (3) "comply with the standard form of tenant HUD lease," "collect and deposit . . . all rents and other amounts due from any tenant . . . and collect, deposit and disburse security deposits;" (4) "maintain a current list of acceptable prospective tenants and undertake all arrangements necessary and incidental to the acceptance of rental applications and the execution of Leases;" (6) "perform such other acts and deeds as are reasonable, necessary and proper in the discharge of [Triumph's] rental duties;" (7) "participate in the inspection of each dwelling unit identified in the Lease together with the tenant prior to move-in and upon move-out, and record in writing any damages to the unit at the time the tenant moved in and any damage occurring during the tenant's occupancy;" (8) "be responsible for or assist [Coppertree] in the certification and recertification of project tenants who dwell in units covered by a Housing Assistance Payments Contract ("**HAP Contract**");" and (9) "take all reasonable action to secure full compliance by each tenant with the terms of such tenant's Lease."

57.     When Coppertree terminated the Management Contract with Triumph and installed a new property manager, 71 of the 324 units were vacant, and most were not ready to be leased. Additionally, when Coppertree installed a new property manager, at least 44 tenants owed more

than $1,000 in unpaid rent, and these tenants were an average of four months in arrears for the unsubsidized portion of their rent. Triumph also failed to maintain tenants' eligibility for HUD-subsidized units, resulting in additional lost rental income. Triumph failed to properly and timely process or update tenant HUD recertifications; when the management contract was terminated, more than 45 resident recertifications were past due.

58. Triumph did not place tenants in properly-sized units, and 30 residents were on the transfer list waiting to be moved to an apartment of sufficient size for their household. If a tenant was entitled to be in a larger apartment, they should have been moved, which would have resulted in an increase in monthly rent. Some tenants had been waiting for years for a properly sized unit, despite the availability of 71 vacant units when Coppertree terminated the Management Contract. This, along with Triumph's failure to maintain tenant waiting lists and failure to timely process rent increases, resulted in significant loss of rental income to Coppertree.

59. To induce Coppertree to enter into the Management Contract, Ponte and Jones had represented to Taylor that Triumph had stable and reliable employees with relevant Section 8 housing experience. However, Ponte and Jones knew at the time they made the representations to Taylor as to the stability and competency of Triumph's employees and staff that Triumph did not have the capability to adequately and appropriately provide Rental Services for the Coppertree Property. Coppertree relied on these representations and as a result it has suffered damages.

**4. Triumph's failure to maintain and repair the Coppertree Property**

60. As the property manager, Triumph was responsible for maintaining the Property in a decent, safe, and sanitary condition. Section IV.4 of the Management Contract required Triumph to maintain the Coppertree Property "in a rentable state of repair, all in accordance with all

applicable Requirements." The services that Triumph agreed to provide in section IV.4 of the Management Contract are referred to as the "Maintenance and Repair Services."

61. Triumph breached both the Management Contract by failing to provide Maintenance and Repair Services, including but not limited to its failure to pay "[s]pecial attention . . . to preventative maintenance . . . and [to provide] the services of a regular superintendent," to "contract with qualified independent contractors for the maintenance and repair of major mechanical systems, and for the performance of extraordinary repairs beyond the capability of regular maintenance personnel," to "systematically and promptly receive and investigate all service requests and complaints from tenants, take such action thereon as may be justified, and shall keep records of the same, [including using] all reasonable efforts to service emergency requests on a 24 hour basis," and to "purchase . . . all materials, equipment, tools, appliances, supplies, and services necessary for proper maintenance and repair of the" Coppertree Property.

62. At the time Coppertree terminated the Management Contract, the doors and windows in seven to 10 units were so damaged that the units were not suitable for tenants, and some of these units had become occupied by homeless persons, requiring eviction of the occupants and significant repairs to the units.

63. There were past due, unfulfilled work orders from neglected tenants whose air conditioning had not worked for months during the Texas summer. Other tenants lacked working stoves and were missing dishwashers. Triumph also had failed to mow the grass, which had grown to over 18 inches in many areas.

64. Triumph also failed to obtain an occupancy permit for a new community building on the Coppertree Property because Triumph's check for the permit was returned for insufficient funds.

65.     Other code violations were never addressed or corrected by Triumph, and the City of Houston would not process new inspection requests for the property until the new management brought the property back up to code.

66.     Other wrongful acts included Triumph's failure to properly or timely respond and resolve deficiencies identified in the Texas Department of Housing & Community Affairs 2018 inspection, resulting in two $5,000 fines to Coppertree.

67.     Not surprisingly, Triumph's failure to provide Maintenance and Repair Services resulted in the overall deterioration of the Coppertree Property and its reputation, negatively affecting rental of the units and rental income.  In fact, based on data from May 1, 2017 through April 30, 2018—while under Triumph's management—the Houston Police Department designated Coppertree as a "Remedial Action" property. This required Coppertree to pay charges and conduct other remedial actions, including regular reporting and formal inspections of the Property by the City of Houston and the installation of upgraded lighting, landscaping and security, all due to Triumph's failure to maintain the Coppertree Property.

68.     To induce Coppertree to enter into the Management Contract, Ponte and Jones had represented to Taylor that Triumph had stable and reliable employees with relevant Section 8 housing experience. However, Ponte and Jones knew at the time they made the representations to Taylor as to the stability and competency of Triumph's employees and staff that Triumph did not have the capability to adequately and appropriately provide Maintenance and Repair Services for the Coppertree Property.  Coppertree relied on these representations and as a result it has suffered damages.

## 5. Triumph's failure to ensure that the Coppertree Property was properly insured

69. In accordance with Article V of the Management Contract Triumph was obligated to "maintain insurance coverage for the [Coppertree Property]." The Management Contract specifically provided that Triumph was to maintain insurance coverage "as necessary under the Requirements or as otherwise required by . . . this Management Contract or by Owner." The Management Contract also provided at V.3 that:

> [i]f the Agent places insurance coverage on behalf of [Coppertree], Agent represents that it currently maintains and shall maintain, with financially sound and reputable insurance companies, insurance on all of [Coppertree's] properties in at least such amounts and against at least such risks as are usually and reasonably insured against by entities of similar size engaged in the same or similar business. Agent agrees that it will not unreasonably reduce the amounts or coverage of such insurance from the amounts or coverage currently in place and that it will increase such amounts and provide additional insurance against such risks such that its insurance in place, from time to time, shall be consistent with the foregoing representation.

### a. The GenStar policy

70. In August 2017, Triumph engaged The Cone Company ("**Cone**"), an Alabama insurance broker, to place property coverage for several properties, including the Coppertree Property.

71. On August 23, 2017, Triumph provided Cone with a list, titled "Portfolio Under Management," that included the Coppertree Property and a request for property, general liability, and umbrella policies for the Coppertree Property.

72. Cone then contacted AmWINS Brokerage of Alabama ("**AmWINS**"), a wholesale insurance broker, to assist it in obtaining a property policy for Triumph. AmWINS contacted insurer General Star Indemnity Company ("**GenStar**") regarding property insurance for Triumph on or about October 25, 2017.

73.     In response to a 119-page application submitted by Cone to AmWINS, GenStar issued Policy No. IAG967120, for the term November 1, 2017 through November 1, 2018 (the "**Policy**"). The Policy did not include the amounts of coverage that was currently in place for the Coppertree Property. Coppertree was not named as a primary insured or even as an additional named insured on the Policy; the Policy named only Triumph and certain other properties as named insureds. Moreover, the Policy included scheduled, not blanket insurance, for the Coppertree Property.

74.     GenStar did not send the Policy to AmWINS until December 7, 2017.   On information and belief, Triumph did not receive a copy of the Policy from AmWINS until spring 2018.

### b.     The Coppertree Property fire

75.     On December 9, 2017, barely a month after the Policy incepted and well before Coppertree received a copy of it, a fire occurred on the Coppertree Property, causing damage to Coppertree in excess of $1.2 million.

76.     Triumph reported the fire to GenStar on Coppertree's behalf. GenStar initially acknowledged the claim and accepted coverage for it, then refused to pay the claim.

### c.     GenStar sues Triumph to rescind the Policy

77.     On April 25, 2018, GenStar sued Triumph in the United States District Court for the Northern District of Georgia, asserting claims for declaratory action based on rescission, and, in the alternative, declaratory judgment based on limited coverage. GenStar alleged that the Policy should be rescinded based upon material misrepresentations made to GenStar by Triumph during the underwriting of the Policy.

78.     In this Georgia action, Triumph asserted counterclaims against GenStar, including claims for breach of contract and reformation of the Policy.

### d.     Triumph agrees with GenStar to rescind the Policy over Coppertree's objection

79.     While the litigation was pending, Coppertree learned that GenStar and Triumph were engaged in settlement discussions.

80.     On several occasions, in correspondence and communications with Triumph, Coppertree asked Triumph to include it in the settlement discussions and informed Triumph that it was not authorized to enter into any settlement that would harm Coppertree's ability to pursue claims against GenStar or any other party. For example, on October 3, 2019, counsel for Coppertree wrote to counsel for Triumph and stated: "Coppertree does not authorize Triumph to bind or in any way limit Coppertree's ability to pursue claims or seek a recovery against GenStar, or any of the other parties involved in the insurance dispute outlined in the Georgia case."

81.     Ignoring this request, on November 21, 2019, Triumph informed Coppertree that it had "negotiated an agreement with [GenStar] to settle all claims between [GenStar] and Triumph regarding the Policy." The letter concluded: "Please be assured that Triumph is doing all that it is aware of to protect your interests and will provide you updates as the matter progresses." Contrary to these representations, Triumph has not protected Coppertree's interests or kept Coppertree updated on developments.

82.     Triumph, with GenStar, filed a joint motion to dismiss the Georgia case, disburse to Triumph funds representing the Policy premiums in the amount of $638,878, which were held in the Georgia court's registry, and rescind the Policy. The Georgia court signed GenStar and Triumph's Consent Order to Dismiss Suit, Disburse Funds, and Rescind Policy on December 13,

2019. The Georgia court ordered that the court clerk disburse the Policy premium held in the court's registry directly to Triumph by check.

83.     Based on the collusive agreement between GenStar and Triumph to rescind the Policy despite Coppertree's pending claim, GenStar maintains that Coppertree cannot maintain any claim under the Policy for its losses relating to the December 9, 2017 fire.

84.     Coppertree has requested information regarding the disposition of the settlement funds or the initiation of an interpleader action, but it has not received a definitive response to its inquiries.

## V.     CAUSES OF ACTION

### Count I – Breach of the Management Contract (Against Triumph)

85.     Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

86.     The Management Contract is a valid and enforceable contract.

87.     Under the Management Contract, Triumph agreed to provide Rental Services, Maintenance and Repair Services, and Records and Report Services, on behalf of the Coppertree Property. Triumph also agreed to ensure that the Coppertree Property was properly insured.

88.     Coppertree fully performed all obligations under the Management Contract and paid Triumph fees for its property management services.

89.     As set forth above, Triumph breached its contractual obligations to provide Rental Services, Maintenance and Repair Services, and Records and Report Services. Triumph also failed to ensure that the Coppertree Property was properly insured. as required by the Management Contract.

90. Triumph further exacerbated the damages caused by its breaches through its agreement with GenStar to rescind the Policy in violation of Triumph's agreement to ensure that the Coppertree Property was properly insured.

91. Coppertree has been damaged by Triumph's breaches of the Management Contract and it seeks to recover its damages from Triumph.

92. Coppertree is entitled to recover its reasonable attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

**Count II – Defendants' Violations of § 17.46(b) of the
Texas DTPA for Deceptive Acts or Practices
(Against Triumph, Ponte, and Jones)**

93. Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

94. Coppertree is a "consumer" as defined by TEX. BUS. & COM CODE § 17.45(4). Coppertree sought to acquire and/or acquired goods or services from Triumph. An attorney did not represent Coppertree in negotiating the terms of the Management Agreement with Defendants.

95. Triumph, Ponte and Jones violated TEX. BUS. & COM CODE § 17.46(b), which provides that the term "false, misleading, or deceptive acts or practices" includes: (7) representing that "services are of a particular standard [or] quality;" (12) "representing that an agreement confers rights, remedies, or obligations which it does not have or involve;" and (24) "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." TEX. BUS. & COM CODE § 17.46(b)(7), (12) & (24).

96.     Specifically, before Coppertree entered into the Management Contract with Triumph, Ponte and Jones represented to Coppertree that they had an established and good working relationship with HUD that would be a benefit to Coppertree and the Coppertree Property. Ponte and Jones continued to make these representations about their relationship with HUD and the benefits to the Coppertree Property during the course of the Management Contract, up to the July 2018 MOR inspection by HUD.  However, these representations were in fact false because neither Triumph nor Ponte nor Jones had an established and good working relationship with HUD. However, Coppertree did not learn of these false statements about their relationship with HUD until Taylor was contacted by Michael Gamez at HUD in September 2018.  At that time, Taylor learned that HUD did not trust Ponte, that HUD thought Ponte and Triumph were incompetent to manage Section 8 housing projects, and that Ponte had made representations to HUD in Texas which HUD determined were false.  These false representations by Ponte and Jones were inherently undiscoverable by Coppertree until Michael Gamez advised Taylor of Ponte's and Triumph's dishonesty and incompetence.

97.     Additionally, to induce Coppertree to enter into the Management Contract, Ponte and Jones represented that Triumph had a competent and robust accounting and finance department, that Triumph had stable and reliable employees with relevant Section 8 housing experience, and that Triumph had the knowledge and expertise to properly prepare and maintain accurate tenant and financial information as required by HUD.  These representations were made to induce Coppertree into the Management Contract with Triumph, but at the time they were made Ponte and Jones knew Triumph did not have the expertise or staff capability in Texas to provide Rental Services, Maintenance and Repair Services, and Record and Report Services to Coppertree. Coppertree relied on these misrepresentations to its detriment and the facts regarding these false

representations by Ponte and Jones were inherently undiscoverable by Coppertree until Gates began providing back-channel information and criticism of Triumph in early 2018.

98.     The representations set forth herein by Ponte and Jones were intentionally and knowingly false or misleading when made and Coppertree relied on the representations to its detriment by entering into the Management Contract with Triumph and then continuing to have Triumph manage the Coppertree Property.

99.     Triumph's, Ponte's and Jones' misrepresentations and failures to disclose information regarding their relationship with HUD and the services they provided or failed to provide were producing causes of Coppertree's damages, and they were intended to induce Coppertree into acquiring the management services from Triumph and continuing to use Triumph to manage the Coppertree Property, which Coppertree would not have done and would not have continued to do had the truth been known.

100.    Triumph's, Ponte's and Jones' conduct was committed recklessly, knowingly and/or intentionally, because at the time of their acts and representations these Defendants had or should have had actual awareness of the falsity, deception or unfairness of their acts and representations and Coppertree detrimentally relied upon these Defendants' acts and representations, which caused Coppertree's injury and damages.

### Count III – Negligent Misrepresentations
### (Against Triumph, Ponte, Jones, and Gates)

101.    Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

102.    In the course of their business of managing the Coppertree Property, Defendants negligently supplied false information to Coppertree.  Defendants did not use reasonable care in

obtaining or communicating the information and Coppertree justifiably relied on the false information.

103.     Specifically, as set out above, including in paragraphs 23, 41-42, and 96, Ponte and Jones made negligent misrepresentations regarding their relationship with HUD, when neither Triumph nor Ponte nor Jones had an established and good working relationship with HUD in Texas.  Additionally, as set out above, including in paragraphs 46-47, 50-51, 59, 68 and 97, Ponte and Jones represented that Triumph had a competent and robust accounting and finance department, that Triumph had stable and reliable employees with relevant Section 8 housing experience, and that Triumph had the knowledge and expertise to properly prepare and maintain accurate tenant and financial information as required by HUD, when Triumph did not.  The facts regarding these false representations by Ponte and Jones were inherently undiscoverable by Coppertree until Gates began providing back-channel information and criticism of Triumph in early 2018.

104.     Further, as set out above, including in paragraphs 46-47, in an October 3, 2018 email to Koren, Ponte made representations promising that a third-party compliance person would review and correct all files and perform a 100% REAC protocol inspection for the Coppertree Property at Triumph's cost, but the costs were in fact charged back to Coppertree.

105.     As a direct and proximate cause of these false representations by Defendants, Coppertree suffered damages that it seeks to recover.

### Count IV – Fraudulent Inducement
### (Against Triumph, Ponte, and Jones)

106.     Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

107. In the alternative or in addition to the other Counts, Defendants committed fraud by making misrepresentations to Coppertree regarding their management of the Coppertree Property, as set out above. When Defendants made the representations to Coppertree, the representations were material, the representations were false, and Defendants knew the representations were false, or they made the representation recklessly, as a positive assertion, and without knowledge of their truth. Defendants made the representations with the intent that Coppertree would act on them, Coppertree relied on the representations, and the false representations caused Coppertree injury.

108. Additionally, Defendants committed fraud by nondisclosure. Defendants concealed from or failed to disclose certain facts to Coppertree, as set out above. Defendants had a duty to disclose the facts to Coppertree, the facts were material, and Defendants knew Coppertree was ignorant of the facts, and did not have an equal opportunity to discover the facts. Defendants were deliberately silent when they had a duty to speak and by failing to disclose the facts, Defendants intended to induce Coppertree to take some action or refrain from acting. Coppertree relied on Defendants' nondisclosure, and it was injured as a result of acting without the knowledge of the undisclosed facts. The facts regarding these false representations were inherently undiscoverable by Coppertree until Gates began providing back-channel information and criticism of Triumph in early 2018.

### Count V – Negligence
### (Against Gates)

109. Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

110. In his individual capacity and as part of his New Company Scheme to ingratiate himself to Taylor and Coppertree, Gates went beyond the scope of his duties as COO of Triumph

and undertook to personally perform services to benefit Coppertree and to correct some of Triumph's failures in the operation, maintenance and management of the Coppertree Property. On several occasions, Gates traveled to the Coppertree Property as part of performing these personal services, and took an extraordinary interest in the Coppertree Property that would not be seen or expected of a COO. This was all part of Gates' New Company Scheme to get Taylor to start a new property management company, that Gates would run and from which he would derive personal financial benefit. *See* Paragraphs 26-34, 38, and 40.

111. One who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care, but Gates failed to exercise reasonable care in performing the services to correct or fix failures by Triumph. Coppertree relied upon Gates' performance of the services he voluntarily agreed to undertake as part of his New Company Scheme and as a result Coppertree suffered damages.

### Count VI - Declaratory Judgment and Order to Deposit Funds Into the Registry of the Court (Against Triumph)

112. Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

113. An actual and immediate controversy exists between Coppertree and Triumph in connection with the funds in the amount of $638,878, which were originally deposited by an insurance company into the registry of a federal district court in Georgia and identified as premiums paid by insured property owners, including Coppertree. These funds have been or will be distributed to Triumph in accordance with the Georgia court's December 12, 2019 Consent Order (the "**Funds**"). A portion of the Funds belong to Coppertree, but Triumph has failed and refused to return Coppertree's share of the Funds to Coppertree.

114.     Because Triumph has failed to return any portion of the Funds to Coppertree, a bona fide dispute exists over what portion of the Funds belong to Coppertree and what portion belong to others.  Accordingly, under Texas Civil Practices and Remedies Code Sections 37.003 and 37.004, a justiciable controversy exists concerning the rights, status, and legal relations between the parties as to the Funds and Coppertree seeks a determination from the Court as to its rightful share.  Further, Coppertree requests that the Court have Triumph deposit the Funds into the registry of this Court.

115.     Because of Triumph's multiple failures, other property owners have asserted claims or filed lawsuits against Triumph in multiple venues, seeking recovery of amounts that, on information and belief, would render Triumph insolvent. In addition, on or about December 3, 2019, Weller Residential, a multifamily real estate investment company, publicly announced that it was acquiring certain assets of Triumph.  As a result of Weller Residential's acquisition of certain Triumph assets, Triumph has either ceased its operations or is in the process of doing so. Consequently, the Funds are in danger of being depleted.

116.     Because Coppertree is entitled to a portion of the Funds, Triumph has refused to return Coppertree's share to it, and the Funds are in danger of being depleted, the Court has the inherent power to order the Funds deposited into the registry of this Court, which Coppertree requests that the Court do.

### Count VII - Attorney's Fees

117.     Coppertree realleges and incorporates each and every foregoing paragraph as if fully set forth herein.

118.     As a result of Defendants' conduct, Coppertree has been forced to retain attorneys to pursue its claims.  Accordingly, Coppertree is entitled to recover its reasonable and necessary

attorney's fees incurred in this action in accordance with Chapter 38 of the Texas Civil Practice & Remedies Code and Chapter 17 of the Texas Business & Commerce Code.

119.     Additionally, Coppertree seeks to recover its reasonable and necessary attorneys' fees and cost as are equitable and just under Texas Civil Practice & Remedies Code section 37.009.

## VI.     DAMAGES

120.     As a result of Defendants' conduct, Coppertree has suffered economic damages in excess of $3,500,000, all of which it is entitled to recover, jointly and severally from Defendants. Coppertree's damages include all actual and consequential damages, statutory damages, and exemplary damages as a result of Defendants' breach of duties owed as described above.

121.     Pursuant to the DTPA, Coppertree is entitled to recover treble damages because Defendants' conduct and actions were committed knowingly.

## VII.     JURY DEMAND

122.     Coppertree demands a trial by jury and has tendered the appropriate fee.

## VIII.     CONDITIONS PRECEDENT

123.     All conditions precedent have been, or will be, met as required by law.

## IX.     DISCOVERY RULE

124.     Because Coppertree's injury and damages were inherently undiscoverable and/or fraudulently concealed, the discovery rule applies as to any alleged statute of limitations defense.

## X.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Coppertree Village Holdings, LLC and Coppertree Apartments LLC request that Defendants be cited to appear and answer herein, that the Court order Triumph to deposit the Funds, as defined herein, into the registry of the Court,

and that upon a final hearing judgment be entered for Plaintiffs and against Defendants for the following:

    a.  Plaintiffs' share of the Funds;

    b.  actual and consequential damages;

    c.  exemplary and punitive damages;

    d.  statutory damages and interest;

    e.  attorney's fees and expenses;

    f.  pre-judgment and post-judgment interest at the maximum rate allowed by law;

    g.  costs of court; and

    h.  all other and further relief, at law or in equity, to which Plaintiffs may show itself justly entitled.

Respectfully submitted,

/s/ Carol Payne
Carol C. Payne
State Bar No. 0078865
Southern District No. 18111
cpayne@estesthornecarr.com
Linda G. Moore
State Bar No. 14359500
Southern District No. 20049
lmoore@estesthornecarr.com
**ESTES THORNE & CARR PLLC**
3811 Turtle Creek Blvd., Suite 2000
Dallas, Texas  75219
Telephone:  (214) 599-4000
Telecopier: (214) 599-4099

**ATTORNEYS FOR PLAINTIFFS COPPERTREE VILLAGE HOLDINGS, LLC AND COPPERTREE APARTMENTS LLC**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on April 10, 2020, a true and correct copy of the foregoing Amended

Complaint was served upon all counsel of record via the Courts electronic filing system as follows:

Thomas F. O'Connell
Gauntt, Koen, Binney & Kidd, LLP
25700 I-45 North, Ste 130
Spring, Texas 77386
Tom.Oconnell@gkbklaw.com

Lawrence R. Moon
Poli, Moon & Zane, PLLC
2999 N. 44th St., Suite 325
Phoenix, AZ 85018
lmoon@pmzlaw.com

/s/ Linda G. Moore
Linda G. Moore